# EXHIBIT A-1

FILED
4/18/2017 6:01:20 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Monica Hernandez

**2CIT PPS / SAC2
W/JD**

## CAUSE NO. _____ 2017CI07134



| | | |
|---|---|---|
| JBRF, LLC, JOSHUA FELKER, AND LONESTAR HANDGUNS, LLC | § | IN THE DISTRICT COURT |
| PLAINTIFFS | § | |
| | § | |
| VS. | § | **225TH** JUDICIAL DISTRICT |
| | § | |
| OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, AND TRINITY TITLE OF TEXAS | § | |
| DEFENDANTS | § | BEXAR COUNTY, TEXAS |

### PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE COURT:

NOW COME JBRF, LLC, JOSHUA FELKER and LONESTAR HANDGUNS, LLC, Plaintiffs in the above-styled and numbered Cause, and file Plaintiffs' Original Petition complaining of OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, and TRINITYTRINITY TITLE OF TEXAS, jointly and severally, and for cause would respectfully show the following:

### DISCOVERY CONTROL PLAN

1.   Discovery in this cause should be conducted under a level 3 discovery control plan.

### PARTIES

2.   Plaintiffs, JBRF, LLC, JOSHUA FELKER and LONESTART HANDGUNS, LLC are individuals and businesses either residing in Bexar County, Texas or Bexar County, Texas is their principle place of business.

3.   Defendant OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY ("Old Republic") provides title insurance policies, real estate transaction, and mortgage lending products and services to individual consumers, mortgage lenders, businesses, and government

1

agencies in the United States. Old Republic National Title Insurance Company, formerly known as Title Insurance Company of Minnesota is based in Minneapolis, Minnesota. It has additional offices in the United States. Old Republic National Title Insurance Company operates as a subsidiary of Old Republic National Title Holding Company.  Old Republic National Title Company does business in the State of Texas and has offices in Bexar County, Texas where the events herein occurred.  Old Republic National Title Insurance Company may be served with process by serving its First Vice President, Division Counsel, Shannon J. Skurner at 777 Post Oak Blvd., Suite 240, Houston, Texas 77056-3259.

4.       Defendant TRINITY TITLE OF TEXAS LLC ("Trinity") is a domestic limited liability company doing business in the state of Texas with offices in Bexar County wheerethe events herein occurred.  Trinity may be served with process by serving its Manager, Dale Edward Lewis at 8303 North Mopac Expressway, Suite 100-A, Austin, Texas 78759-8335.

## VENUE AND JURISDICTION

5.       Venue is proper in Bexar County, Texas pursuant to Texas Civil Practice and Remedies Code § 15.002(a) because it is the county in which all or a substantial part of the acts and/or omissions occurred.  Furthermore, Defendants solicited and entered into a contract with Plaintiffs in Bexar County and a substantial portion of it performance took place in Bexar County. The Court has jurisdiction over each party because they either reside in Texas or solicited the transaction in Texas.  Further, the property, the subject of a contract and this lawsuit, is located in Bexar County, Texas. Texas Civil Practice and Remedies Code §15.035(a).

6.       Plaintiffs' damages are within the Court's jurisdictional limits.  Further, Plaintiffs seek monetary relief over $200,000.00 but not more than $1,000,000.00. Tex. R. Civ. Pro. 47 (c)(4).

2

## FACTUAL BACKGROUND

7.      Joshua Felker's company, JBRF, LLC, which owns Lone Star Handguns, LLC, closed on the Converse property at issue on April 19, 2013.  The property was specifically sold to JBRF, LLC as a commercial property for use as a handgun safety range through a commercial loan secured by the Bank of Victoria.

8.      The subject 115 acre property sits at the back of a 1.5 mile ingress and egress easement, without which it is otherwise landlocked.  The property is on a 100-year floodplain and no other means of ingress and egress to the frontage road (Graytown) is possible.

9.      Access to the property can first be traced back to a 1901 conveyance to create a "road" to the property.  *See* Exhibit "1", a chart of all relevant conveyance language.  The unified 115 acre tract, easement and 95 acre tract fronting Graytown (and over which the easement passes) was devised to Alma Schwenn Huebner and her siblings who, in 1950, conveyed the 115 acre tract and non-exclusive use of the easement to Gus and Telka Schwenn referencing the 20 foot 1902 roadway.  In 1951, Alma Schwenn Huebner conveyed to Gus and Telka a further use of the easement over her personal property which conveyance language includes:

> ...a 20' wide easement on the 60 acre tract (no. 2) and a 20' road easement on a 70 acre tract (No. 1) ... and also a strip 20 feet wide and 1100.95 feet long...And I hereby grant and convey unto the said Gus Schwenn and Telka Schwenn **the above described right-of-way over and across my land as aforesaid, together with free ingress, egress and regress...by foot, wagon, carriages, automobiles and other vehicles, horses, mules and cattle as by them...shall be necessary or convenient, at all times and seasons forever, in, upon and out of said right-of-way** in common with me and,...to their proper use and behoof in common with me...

10.     Alma later conveyed the 95 acre frontage property to her daughter, Etta Mae Klug, who, in 1977, conveyed same to Anne Friesenhahn and her husband subject to the existing

3

easement. In 1992, Prosper Bronder bought the 115 acre property from the estate of Gus Schwenn which conveyed all rights thereto. The 115 acre property is unzoned and is a multi-use property for residential, farming and business purposes. The transaction was handled by Alamo Title Company as an all cash deal and closed very quickly. Anxious to close and apparently unaware of the Schwenn easement conveyance despite its filing with the Bexar County Deed records, Alamo required a separate conveyance document from Friesenhahn to Bronder which conveyed a 20' wide non-exclusive easement for ingress, egress and water. The survey referenced in and attached to that conveyance is for the 115 acre tract – not the 20' easement. Thus, Friesenhahn did not convey anything additional to Bronder other than the water easement.

11.     The Bronders transferred the property to their children, the Houstons, in 1999 who conveyed same to these Plaintiffs in 2013. When JBRF, LLC bought the property in 2013, Trinity did not identify the Schwenn easement broad conveyance but relied solely on the 1992 Friesenhahn conveyance which does not describe the uses which were conveyed with the easement and limits the easement to a 20' easement by metes and bounds description.

12.     JBRF's 2013 easement conveyance was "was subject to all zoning laws, regulations and ordinances of municipal and/or government authorities that relate to JBRF's property and which are and were in effect at the time of conveyance."

13.     The Texas Legislature passed Sections 235.001, Local Government Code House Bill 2252, Acts 1989, 71st Leg., ch. 296 s1 at 1253) ("application of fire code") which became effective on January 1, 1991. The subject property is located in an unincorporated area of the county and the statute provided that the Fire Code would apply to "commercial establishments" or

4

"public buildings" constructed therein.[1]  Because the State of Texas effectuated the Fire Code for use in certain structures in unincorporated county areas, Plaintiffs' extra-territorial location was subject to that Code on January 1, 1991 for any establishment that was used for commercial purposes.

14.     Bexar County specifically adopted the Fire Code on August 24, 1993. *See* Exhibit "2". The 1992 Fire Prevention Code, required the following:

**SECTION 3-6 FIRE LANES**

3-6.1   Fire lanes shall be provided and maintained for fire department equipment to every building.   Fire lanes shall not be not less than 20 feet (6.1 m) of unobstructed width, able to withstand live loads of fire apparatus and have a minimum of 13'6" (4.1 m) of vertical clearance.  An approved turnaround for fire apparatus shall be provided where an access road is a dead end and is in excess of one hundred and 50 feet (45.8 m) in length.  The turnaround shall have a minimum centerline radius of 50 feet (15.3 m).  The grade of the fire lane shall be within the limits established by the authority having jurisdiction.

---

[1] The term "commercial establishment" was not defined by the statute. The Attorney General also defined the meanings of these terms in Letter Opinion 90-016, dated April 12, 1990, specifically as they would apply to the Act.  As to "commercial establishment," the Attorney General wrote,

> The inclusion of industrial facilities evidences a legislative intent that "commercial establishment" have a broader definition than a place where commodities are bought and sold. The provision relating to buildings to be covered by a fire code in section 235.002 is a remedial statute and should be liberally construed to effect its purpose. *Board of Ins. Comm'rs. v. Great S. Life Ins. Co.*, 239 S.W.2d 803 (Tex. 1951). In Jordan, the United States Supreme Court stated that the terms "commercial" or "commerce" had for more than a century been judicially recognized to "embrace every phase of commercial and business activity and intercourse." We believe that the legislature intended "commercial establishment," as that term is used in section 235.002, to include any building in which any business activity coming within the foregoing definition of "commerce" or "commercial" is transacted.

As to "public building", the Attorney General wrote:

> ...statutes dealing with the health, safety, and welfare of the public define "public building" as any building open to the public. The fire code, as a remedial statute, should be liberally construed to effect its purpose. Since it is a statute relating to the health, welfare, and safety of the public, we do not believe the legislature intended to limit the meaning of "public buildings" to buildings owned by the public. We believe that "public building," as that term is used in the fire code, includes any building open to the public.

5

3-6.2   Fire lanes shall be provided for all buildings that are setback more than 150 feet (45.75 m) from a public road or exceed 30 feet (9.14 m) in height and are setback over 50 feet (15.25 m) from a public road.

15.      When JBRF, *et al* purchased the property and easement in 2013, Trinity and Old Republic oversaw the transaction and performed the necessary title functions, including title search.

16.      In 2013, when Plaintiffs bought the property, the City of San Antonio relied on the 2012 edition of the International Fire Code which provided:

**SECTION 503**
**FIRE APPARATUS ACCESS ROADS**

**503.1** Where required. Fire apparatus access roads shall be provided and maintained in accordance with Sections 503.1.1 through 503.1.3.
**503.1.1 Buildings and facilities.** Approved fire apparatus access roads shall be provided for every facility, building or portion of a building hereafter constructed or moved into or within the jurisdiction. The fire apparatus access road shall comply with the requirements of this section and shall extend to within 150 feet (45720 mm) of all portions of the facility and all portions of the exterior walls of the first story of the building as measured by an approved route around the exterior of the building or facility...
**503.2 Specifications.** Fire apparatus access roads shall be installed and arranged in accordance with Sections 503.2.1 through 503.2.8.
**503.2.1 Dimensions.** Fire apparatus access roads shall have an unobstructed width of not less than 20 feet (6096 mm), exclusive of shoulders, except for approved security gates in accordance with Section 503.6, and an unobstructed vertical clearance of not less than 13 feet 6 inches (4115 mm).
**503.2.2 Authority.** The fire code official shall have the authority to require an increase in the minimum access widths where they are inadequate for fire or rescue operations...
**503.2.4 Turning radius.** The required turning radius of a fire apparatus access road shall be determined by the fire code official.
**503.2.5 Dead ends.** Dead-end fire apparatus access roads in excess of 150 feet (45 720 mm) in length shall be provided with an approved area for turning around fire apparatus.

6

17.     As was specifically known to Old Republic and Trinity, JBRF, LLC and Lone Star, the purchasing entities, were solely commercial enterprises.  Thus, the Houstons sold the property to a commercial enterprise, JBRF LLC, which sale was subject to the fire code adopted by the government and municipal authorities and in effect in 2013 and as they related to JBRF's property.

18.     Accordingly, JBRF's easement required an unobstructed width of not less than 20 feet (6096 mm), exclusive of shoulders (26 feet per the Fire Marshal's ordinance), an unobstructed vertical clearance of not less than 13 feet 6 inches (4115 mm) and the fire code official shall have the authority to require an increase in the minimum access widths where they are inadequate for fire or rescue operations and determine the required turning radius of a fire apparatus access road.

19.     The 20' foot easement for ingress and egress by metes and bounds description that Trinity pulled for the conveyance was inadequate for the commercial enterprise for which they were representing and performing their title search.

20.     Plaintiffs secured the services of Defendant, Trinity Title of Texas, and agent of Defendants, Old Republic National Title Insurance to perform a title search and underwrite a title policy of the subject property.   At all times relevant herein Defendants were aware of the commercial use that Plaintiffs' planned for the subject property.  Defendants failed to identify for Plaintiff and inform Plaintiff of the restrictions to the use of easement that the City of San Antonio Fire Department had put in place prior to Plaintiffs' purchase of the property.

21.     As a result of Defendants' lack of due diligence, Plaintiffs have been denied a certificate of occupancy to operate their business and are submerged as counter-defendants with the appurtenant neighbors for encroachment on the intended easement conveyance.   Neither Defendant herein, despite knowledge thereof, has provided a defense which has wrecked financial devastation on the business and Mr. Felker personally.   Further, Plaintiffs have had to incur

7

enormous cost to retain counsel to seek variances to the ordinances, modify the property to obtain a certificate of occupancy by alternate accommodation to the fire marshal's ordinance and suffered business and customer compromise.

22.     This suit is brought against Trinity and Old Republic for the damages suffered by Plaintiffs as a result of the proximate and/or producing cause of the negligence, breach of contract, lack of due diligence and misrepresentations by said Defendants.

## CAUSES OF ACTION AGAINST OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY and TRINITY TITLE OF TEXAS

### Breach of Contract

23.     Trinity breached the contract with Plaintiffs in that it failed to establish an accurate ownership and deed history of real property, determine what other factors may affect the usability of said real property, ensure the accuracy of closing documents and, as a result, assist in the consummation of real estate transactions. In the company's title review, the public record research is performed to verify the accuracy of the title abstract.  Though the title abstract should be complete and accurate, title companies create a timeline of property ownership to ensure that no details have been overlooked. In the process of review, discovered liens or other ownership issues must be identified by the title company to fully disclose these issues to the buyer and seller.

24.     The owner's title policy insures its protection from defects in title that render the property useless for the commercial purpose for which it was acquired.  "A title insurance policy is a contract of indemnity that imposes a duty on the insurance company to indemnify the insured against losses caused by defects in title."

25.     Plaintiffs entered into a written and/or oral contract with Defendant TRINITY to act as the title company  and relied to their detriment on the representations made that the property and all title thereto was fit for the commercial purposes their clients required.

8

26.     Defendant OLD REPUBLIC breached its contractual obligations to Plaintiffs by failing to defend and indemnify them in litigation wherein the claims fell within the purview of coverage; *to wit*, the Title policy was issued to protect JBRF, LLC against any property loss or damage it might experience because of liens, encumbrances or defects in the title to the property. See, Exhibit "3", attached hereto and incorporated by reference herein.  Exhibit "B" to the Title policy issued JBRF, LLC provides surveys of the 115 acre property acquired for business by JBRF ("Exhibit A") and the 20' easement conveyance of 1992 ("Exhibit "B").  ORT FORM T-1 (which is missing several pages, including portions of the "Covered Loss section" from the policy provided JBRF, LLC provides the following EXCLUSION FROM COVERAGE:

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, Uniform Development Code, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to:

(i) the occupancy, use, or enjoyment of the Land;...

Further, under Schedule B, EXCEPTIONS FROM COVERAGE:

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of the terms and conditions of the leases and easements, if any, shown in Schedule A, and the following matters:

1. The following restrictive covenants of record itemized below:
Item No. 1, Schedule B, is deleted in its entirety.

However, under COVERED RISKS:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS, Old Republic National Title Insurance Company, (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:...

9

Exhibit A-1

4. No right of access to and from the Land.

5. The violation or enforcement of any law, Uniform Development Code, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to:

      (a) the occupancy, use or enjoyment of the Land;
      (b) the character, dimensions or location of any improvement erected on the Land;
      (c) subdivision of land; or
      (d) environmental protection

if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

27.      For the reasons that follow, the exclusions and exceptions do not apply to the subject loss and JBRF, LLC is entitled to the protections of the policy as covered risks.

(A)      Exception for terms and conditions of the leases and easements, if any, shown in Schedule A, and Item No. 1, Schedule B.

28.      This exception is inapplicable in that neither the terms or conditions of the easement necessary for ingress and egress to the JBRF, LLC have not damaged JBRF, LLC. What has damaged JBRF, LLC is the enforcement of a Uniform Development Code which has restricted the occupancy, use and enjoyment of the property purchased and depriving JBRF, LLC of a Certificate of Occupancy which is irreparably damaging his business to the extent the business may be denied the right to operate.

(B)      Exclusion for (a) Any law, permit, or governmental regulation (including those relating to building and zoning – [i.e. Uniform Development Code]) restricting, regulating, prohibiting or relating to:

(i)      the occupancy, use, or enjoyment of the Land;…

29.      This exclusion is inapplicable in that the existence of the Uniform Development Code provision at issue has not damaged JBRF, LLC. What has damaged JBRF, LLC is the enforcement of the Uniform Development Code provision which has restricted the occupancy, use

10

Exhibit A-1

and enjoyment of the property purchased and depriving JBRF, LLC of a Certificate of Occupancy which is irreparably damaging his business to the extent the business may be denied the right to operate.

    (C)    Coverage for Damage arising under the Covered Risks

    a.  The subject policy insures against loss or damage sustained or incurred by JBRF, LLC by reasons of (4) no right of access to and from the Land.
    b.  The subject policy insures against loss or damage sustained or incurred by JBRF, LLC by reasons of (5) the violation or enforcement of any law, ordinance, permit or government regulation (including those relating to building and zooming) restricting, regulating, prohibiting or relating to
        i.    The occupancy, use or enjoyment of the Land;...
        ii.   The subdivision of land...



27.    The dominant property at issue (JBRF) is landlocked with no access to frontage ingress/egress except by way of the express easement conveyed for consideration in 1992 by Friesenhahn to Browder. That 20' express easement was conveyed without condition or limitation and broadly provided for the Browder property use "for ingress and egress." The Browder property, now JBRF, LLC has never been limited to any type of use and JBRF specifically bought same for a commercial endeavor as was known to Old Republic's and Trinity's agents.

28.    Specifically, the named insured is the commercial entity. As a result of the City and Fire Marshall enforcement of the Uniform Development Code, JBRF, LLC has no right of access to or from the Land by way of the current easement. Further, that enforcement has denied JBRF, LLC a Certificate of Occupancy and the ability to use and enjoy the land for the purposes for which it was purchased. Defendants' breach of contract has resulted in actual damages to Plaintiffs for which they hereby sue.

11

## Negligence

29.    In the alternative to Plaintiffs' cause of action for breach of contract, should the same be necessary. Defendant TRINITY owed Plaintiffs a common law duty to exercise ordinary care in one or more of the following particulars:

- It failed to establish an accurate ownership and deed history of real property;
- It failed to determine what other factors may affect the usability of said real property;
- It failed to ensure the accuracy of closing documents and, as a result, assist in the consummation of real estate transactions;
- It failed to create a timeline of property ownership to ensure that no details have been overlooked;
- It failed to discover deeds or other ownership issues as required under its title obligations; and
- It failed to fully disclose the liens and other restrictions to the property to protect Plaintiffs.

30.    Likewise, after TRINITY failed to their exercise due diligence to the detriment and harm of these Plaintiffs, Defendant OLD REPUBLIC failed to fulfill its duty to defend and indemnify a covered loss, compromising the financial interests of Plaintiffs and jeopardizing both strategy and outcome of the litigation involving the easement.

## Negligent Misrepresentation

31.    To this extent this claim conflicts with any other cause of action it is pled in the alternative. Defendants TRINITY and OLD REPUBLIC, by and through their employees and/or agents, provided false information to Plaintiffs regarding the fitness of the property for the commercial purposes it was acquired and the lack of protections afforded Plaintiffs when their lack of due diligence led to an inability to secure necessary certificates of occupancy and protections form claims asserted against these Plaintiffs which fell within the purview of coverage for which they paid good and adequate consideration.   Defendants knew or should have known that the information communicated was false information. Defendants' negligent misrepresentations were a proximate cause of damages to Plaintiffs for which they hereby sue.

12

### Requests for Disclosure

32.     Under the authority of Rule 194 of the Texas Rules of Civil Procedure, Plaintiffs request that Defendants disclose, within fifty (50) days of this service of this Petition, the information or material described in Rule 194(a)-(l) of said Rule.

### Discovery Rule

33.     Plaintiffs herein assert the discovery rule as the facts giving rise to their cause of action are on-going with the pendant litigation over the easement and causes of action and damages cannot be fully ascertained despite the exercise of reasonable diligence by these Plaintiffs.     *See Baker v. Eckman*, 213 S.W.3d 306, 311-312 (Tex. 2006).

### DAMAGES

34.     As a producing or proximate cause of the actions and omissions alleged herein Plaintiffs have suffered damages and hereby sue to recover the following:

        a.     Actual damages, including, but not limited to, $300,000;

        b.     Consequential damages;

        c.     Exemplary damages; and

        d.     Reasonable and necessary attorney's fees.

### JURY DEMAND

35.     Plaintiffs have demanded a trial by jury and have tendered the requisite fee.

### Conditions Precedent

36.     All conditions precedent to bringing this lawsuit have been met.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, JBRF, LLC, JOSHUA FELKER and LONESTAR HANDGUNS, LLC, pray that Defendants, OLD REPUBLIC NATIONAL

13

TITLE INSURANCE COMPANY and TRINITY TITLE OF TEXAS, be cited to answer and appear in this Cause and, upon final hearing, Plaintiffs recover from Defendants, jointly and severally, their actual and consequential damages, treble damages, reasonable and necessary attorney's fees and costs of court, together with pre- and post-judgment interest as allowed by law and any and all further relief to which Plaintiffs may be entitled by law or equity.

Respectfully submitted,

FARRIMOND CASTILLO & BRESNAHAN, P.C.
130 E. Travis Street, Suite 350
San Antonio, Texas 78205
Telephone 210.231.0919
Facsimile 210.231.0004

By_____
Mary J. Ibarra-Myers
State Bar No. 10382936
MIbarra@fcbtxlaw.com

14

# Exhibit 2

16

ORIGINAL

REVISED COMMISSIONERS COURT ORDER ADOPTING A FIRE CODE AND
REGULATIONS FOR ITS ENFORCEMENT PURSUANT TO CHAPTER 233 OF
THE TEXAS LOCAL GOVERNMENT CODE

WHEREAS, on November 18, 2003, the Bexar County Commissioners adopted the 2003
International Building and Fire Codes and regulations for their enforcement pursuant to
Texas Local Government Code Chapter 233, Subchapter C; and

WHEREAS, on August 24, 1993, the Bexar County Commissioners Court adopted the
1991 Uniform Building and Fire Codes and regulations for their enforcement pursuant to
Texas Local Government Code Chapter 235 (later renumbered as Chapter 233,
Subchapter C); and

WHEREAS, in 1997, the Commissioners Court amended its Order to adopt the 1994
editions of those fire and building codes; and

WHEREAS, the organizations that issued the fire and building codes adopted in 1997
have jointly promulgated new codes; and

WHEREAS, the County Fire Marshal recommends revising the 1993 and 2003 Court
Orders, as amended in 1997 and 2003, so as to adopt current building and fire codes and
update the fee schedule;

NOW THEREFORE, it is ordered by the Commissioners Court of Bexar County, Texas:

ARTICLE I
REPLACEMENT OF PRIOR ORDERS

1.01    This Order replaces the 2003 REVISED COMMISSIONERS COURT ORDER
        ADOPTING A FIRE CODE AND REGULATIONS FOR ITS ENFORCEMENT,
        and

1.02    This Order replaces the 1993 COMMISSIONERS COURT ORDER ADOPTING
        THE FIRE CODE AND REGULATIONS FOR ITS ENFORCEMENT, as
        amended in 1997.

ARTICLE II
DEFINITIONS

2.01    In this Order:

        (a)    "Commercial Establishment" means a place where commodities or
               services are exchanged, sold or bought.



EXHIBIT
B

Exhibit A-1

(b)  "Public Building" means a place in which the possession and/or use, as well as the property in it, gives members of the public free access.

(c)  "Multi-Family Dwelling" means a structure consisting of four (4) or more residential dwelling units.

(d)  "Substantial Improvement" means:
  1.  the repair, restoration, reconstruction, improvement, or remodeling of a building for which the cost exceeds fifty percent (50%) of the buildings value according to the certified tax appraisal roll for the year preceding the year in which the work was begun; or
  2.  a change in occupancy classification involving a change in the purpose or level of activity in a building, including the renovation of a warehouse into a loft apartment.

(e)  "Date of Substantial Improvement" means:
  1.  the date that the repair, restoration, reconstruction, improvement, or remodel begins; or
  2.  the date the change of occupancy classification begins; or
  3.  the date materials are first delivered for that purpose.

(f)  "Date of Construction" means the date ground is broken for a building, or if no ground is broken;
  1.  the date the first materials are added to the original property; or
  2.  the date foundation pilings are added to the original property; or
  3.  the date a manufactured building or relocated structure is placed on a foundation on the original property.

(g)  "System" means fire alarm, fire extinguishing, smoke control system or other fire control and protection system.

(h)  "Fire Code" shall collectively mean the codes or portions thereof identified and referenced below in 3.01 through 3.04.

(i)  "Fire Chief," "Fire Code Official," "Code Official," or "Building Official" shall mean the Bexar County Fire Marshal or his/her designee.

(j)  "Department of Building Safety," "Department of Fire Prevention," or "Fire Prevention Bureau" shall mean the Bexar County Fire Marshal's Office.

## ARTICLE III
## ADOPTION OF FIRE CODE

3.01  The International Code Council 2003 edition, International Fire Code, referenced standards, and appendix, as previously adopted, are hereby approved and adopted.

Hiberca.2P88

Exhibit A-1

3.02   The International Code Council 2003 edition, International Building Code, referenced standards, and appendix, as previously adopted, are hereby approved and adopted.

3.03   The National Fire Protection Association Life Safety Code 101 as it applies to health-care facilities required to comply with it by Federal or State law, or accreditation regulations, shall govern where differences between it and the International Building or Fire Codes occur, and is hereby approved and adopted.

3.04   The fire-sprinkler requirements of the National Fire Protection Association Life Safety Code 101 as it applies to public assemblies, shall govern where differences between it and the International Building or Fire codes occur, and is hereby approved and adopted for all new structures built after the effective date of this court order.

3.05   The fire-sprinkler requirements of the National Fire Protection Association as it applies to multi-family residential occupancies, shall govern where differences between it and the International Building and Fire codes occur, and is hereby approved and adopted for all new multi-family dwelling structures built after the effective date of this court order.

## ARTICLE IV
## APPLICATION AND CONTENT OF THE FIRE CODE

4.01   Any commercial establishment, public building or multi-family dwelling constructed in unincorporated Bexar County after the effective date of this order must be constructed in accordance with the standards for such a structure propounded in the Fire Code.

4.02   A person may not construct or substantially improve a commercial establishment, public building or multi-family dwelling in an unincorporated area of Bexar County unless a permit is issued therefore in accordance with this Order.

4.03   A building permit issued under this Order will specify the system(s) that the building must have, and the building permit holder or his designee must obtain a permit for each required system.

4.04   The requirements of this Order do not apply to an industrial facility having a fire brigade that conforms to the requirements of the Occupational Health and Safety Administration.

## ARTICLE V
## ADMINISTRATION OF FIRE CODE

5.01    The Commissioners Court of Bexar County, Texas, hereby authorizes the County Fire Marshal to administer this Order.

## ARTICLE VI
## PERMIT APPLICATION AND PROCEDURE

6.01    A person may apply for a building or system permit under this Order by providing to the Fire Marshal:

   (a)    a plan of the proposed building, substantial improvement or system containing all plans and specifications; and

   (b)    a building or system permit fee in accordance with Section 8.01.

6.02    Within 30 days after the date the County Fire Marshal receives an application and fee in accordance with Section 6.01, the County Fire Marshal shall:

   (a)    Issue the permit if the application complies with the Fire Code; or

   (b)    Deny the permit if the plan does not comply with the Fire Code.

6.03    If the Fire Marshal has not issued or denied the permit within 30 days after receiving the application and fee, the construction, substantial improvement, or system is approved for the purposes of this order.

## ARTICLE VII
## INSPECTION; CERTIFICATION OF COMPLIANCE

7.01    The County Fire Marshal shall inspect any building, substantial improvement or system subject to this Order to determine whether the building, improvement, or system complies with the Fire Code.

7.02    The County Fire Marshal or his designee may perform the inspection.

7.03    A building inspector under this Order may enter and perform the inspection at a reasonable time at any stage of the building's construction or substantial improvement and after completion of the building.

7.04    On or before the date that construction or substantial improvement of a building or system subject to this Order is completed, the holder of the permit shall request in writing that the County Fire Marshal inspect the building, substantial improvement, or system for compliance with the Order.

Exhibit A-1

7.05    The County shall begin the inspection within 5 business days of receipt of the written inspection request; otherwise, the building or system is considered approved for the purpose of this Order.

7.06    The County Fire Marshal shall issue a final Certificate of Compliance to the owner of a building if the County's inspector determines, after inspection of the completed building, that all required systems have been approved and that the building complies with the Fire Code.

7.07    If the County's inspector determines, after an inspection of the completed building, that the building does not comply with the fire code;

   (a)    the county shall deny the certificate of compliance; and

   (b)    the building may not be occupied.

## ARTICLE VIII
### FEES

8.01    The fee schedule for services performed by the County Fire Marshal under this Order is attached hereto and incorporated herein as Appendix "A."

8.02    The County Fire Marshal is hereby authorized to assess a penalty of up to, and not to exceed, 10% of the total permit cost for failing to obtain permits as required by State law and this Order.

8.03    All monies collected by the County Fire Marshal under this Order shall be placed in a Special Fund under the control of the County Auditor, and monies in that fund shall be used only for the administration and enforcement of this Order.

## ARTICLE IX
### APPEALS PROCESS

9.01    Within 10 days of receipt of a written permit denial, an applicant may appeal the decision by filing written notice of appeal with the Bexar County Commissioners Court. Absent a timely written notice of appeal, the decision of the Fire Marshal is final and subject to enforcement as set forth in Articles X and XI below.

9.02    Within 30 days of receipt of a notice of appeal, the Commissioners Court shall conduct a hearing at which the applicant will be given an opportunity to present his case and Commissioners Court will determine whether to uphold or overturn the decision of the Fire Marshal,

Exhibit A-1

## ARTICLE X
### INJUNCTION

10.01   The Bexar County District Attorney may seek injunctive relief to prevent the violation or threatened violation of this Order.

## ARTICLE XI
### CIVIL PENALTY

11.01   The Bexar County District Attorney may file a civil action in a court of competent jurisdiction to recover from any person who violates the Fire Code a civil penalty in amount not to exceed $200.00 for each day on which the violation exists. In determining the penalty amount, the Court will consider the seriousness of the violation.

11.02   All monies collected under this Article shall be used for the purpose set out in Section 8.03 of the Order.

## ARTICLE XII
### SEVERABILITY

12.01   If any provision of this Order or its application to any person or circumstances is held invalid for any reason, the invalidity does not affect any other provision or application of this Order which can be given effect without the invalid provision or application, and to this end the provisions of these Regulations are declared to be severable.

## ARTICLE XIII
### EFFECTIVE DATE

13.01   This Order shall become effective on the tenth day following its approval.

PASSED AND APPROVED THIS THE 20th DAY OF September, 2005.

NELSON W. WOLFF
County Judge

SERGIO "CHICO" RODRIGUEZ
Commissioner Precinct 1

PAUL ELIZONDO
Commissioner Precinct 2

LYLE LARSON
Commissioner Precinct 3

TOMMY ADKISSON
Commissioner Precinct 4

Exhibit A-1

ORIGINAL

## COMMISSIONERS COURT ORDER AUTHORIZING RESIDENTIAL PLAN REVIEW AND PERMITTING PURSUANT TO CHAPTER 352 OF THE TEXAS LOCAL GOVERNMENT CODE

WHEREAS, on November 18, 2003, the Bexar County Commissioners adopted the 2003 International Building and Fire Codes and regulations for their enforcement pursuant to Texas Local Government Code Chapter 233, Subchapter C for Commercial, Public, and Multi-family dwellings; and

WHEREAS, the International Code Council produces a similar code for one- and two-family residential properties, and

WHEREAS, Local Government Code, Title 11, Chapter 352, Subchapter B authorizes the County Fire Marshal to review plans of a single-family and multi-family residence upon request of the owner or owners' representative, and

WHEREAS, the County Fire Marshal recommends reviewing single-family and multi-family residential plans for fire and life safety hazards and the establishment of a residential fee schedule;

NOW THEREFORE, it is ordered by the Commissioners Court of Bexar County, Texas:

### ARTICLE 1
### DEFINITIONS

1.01   In this Order:

(a)   "Single-family residence" means a place of residence occupied by a person and a person's immediate family members.

(b)   "Multi-family residence" means a place of residence occupied by more than a single family, and not otherwise regulated by the County Fire Code.

(b)     Provide the applicant/owner with recommendations to improve fire and life safety hazards.

5.03    If the Fire Marshal has not issued the residential building permit within 30 days after receiving the application and fee, the construction is approved for the purposes of this order.

ARTICLE VI

INSPECTION; CERTIFICATION OF COMPLIANCE

6.01    The County Fire Marshal shall inspect the building subject to this Order, to determine whether the building complies with the Residential Code.

6.02    The County Fire Marshal or his designee may perform the inspection.

6.03    A building inspector under this Order may enter and perform the inspection at a reasonable time at any stage of the buildings construction and after completion of the residential building.

6.04    On or before the date that construction of the building subject to this Order is completed, the holder of the permit shall request in writing that the County Fire Marshal inspect the building for compliance with this Order.

6.05    The County shall begin the inspection within 5 business days of receipt of the written inspection request; otherwise, the residential building is considered approved for the purpose of this Order.

6.06    The County Fire Marshal shall issue a final Certificate of Compliance to the owner of a building if the County's inspector determines, after inspection of the completed residential building, that the building complies with the Residential Code.

Exhibit A-1

SERGIO "CHICO" RODRIGUEZ
Commissioner Precinct 1

PAUL ELIZONDO
Commissioner Precinct 2

LYLE LARSON
Commissioner Precinct 3

TOMMY ADKISSON
Commissioner Precinct 4

KIbarra.2006

Exhibit A-1

# Chapter 16.04
# INTERNATIONAL FIRE CODE[1] Amended Ord. 3130

Sections:

16.04.010    Short title – Adopted. Amended Ord. 3130
16.04.011    Fire code official defined.
16.04.015    Emergency vehicle parking. Amended Ord. 3130
16.04.016    Permits and fees.
16.04.020    *Repealed.*
16.04.025    Local amendments of International Fire Code.
16.04.030    Violation – Penalty.

## 16.04.010 Short title – Adopted. Amended Ord. 3130

(1) The International Fire Code is adopted by reference, and shall be in effect in the city of Puyallup. The International Fire Code may be referenced as the "fire code" in this chapter.

(2) The International Fire Code shall be the 2009 Edition of the International Fire Code, published by the International Code Council, Inc., including those standards of the National Fire Protection Association specifically referenced in the International Fire Code, as adopted by the Washington State Building Code Council in Chapter 51-54 WAC, as it now exists or is hereafter amended; provided, that notwithstanding any wording in this code, participants in religious ceremonies shall not be precluded from carrying hand-held candles. The following appendices are specifically adopted:

  (a) Appendix B, Fire-Flow Requirements for Buildings;

  (b) Appendix C, Fire Hydrant Locations and Distribution;

  (c) Appendix D, Fire Apparatus Access Roads;

  (d) Appendix E, Hazard Categories;

  (e) Appendix F, Hazard Ranking;

  (f) Appendix H, Hazardous Materials Management Plan (HMMP) and Hazardous Materials Inventory Statement (HMIS) Instructions. (Ord. 3043 § 1, 2013; Ord. 2962 § 1, 2010).

## 16.04.011 Fire code official defined.

For purposes of this chapter, and any other provisions of the city code addressing, applying, enforcing or interpreting the fire code, the term "fire code official" shall mean any designee authorized by the city manager to serve as the fire code official. (Ord. 2962 § 2, 2010; Ord. 2801 § 1, 2004).

## 16.04.015 Emergency vehicle parking. Amended Ord. 3130

Section 1. Definitions: The following definitions shall apply in the interpretation and enforcement of this chapter.

(A) Emergency Vehicle Lane: That area within any public right of way, easement, or private property designated for the purpose of permitting fire trucks and other fire fighting or emergency equipment to use, travel upon or park.

(B) Park, Parking, Stop, Stand or Standing: Means the halting of any vehicle, whether occupied or not, except when necessary to avoid conflict with other traffic or in compliance with the directions of a police officer or fire official, traffic control sign or signal.

(C) Vehicle: A machine propelled by power, designed to travel along the ground or rail by use of wheels, treads, runners or slides and transport persons or property, or pull machinery, and shall include, but not be limited to, automobile, truck, trailer, motorcycle, tractor, buggy, wagon and locomotive.

Section 2. Requirements/Standards: When required by the Fire code official, emergency vehicle lanes shall be provided around facilities which by their size, location, design, or contents warrant access which exceeds that normally provided by the proximity of City streets.

(A) Lanes shall provide a minimum, unobstructed width of 20 feet and vertical clearance of 13 feet, 6 inches.

(B) Lanes shall be identified by a 4 inch wide line and block letters 2 feet high, painted in the lane, at 50 foot or such other intervals which the Fire code official determines to be reasonable, stating "Emergency Vehicles Only," color to be determined by the Fire code official (bright yellow), and by posting of signs stating "Emergency Vehicles Only - No Parking - Violator Vehicles Subject to Impound." Signs shall be posted on or immediately next to the curb line, or on the building. Signs shall be 12" x 18" and shall have letters and background of contrasting colors, readily readable from at least a 50 foot distance. Signs shall be posted at a minimum no further than 50 feet apart, unless a greater distance is deemed reasonable by the Fire code official, nor shall they be more than 4 feet from the ground unless a greater height is determined necessary by the Fire code official.

C. Emergency Vehicle Lanes shall be either asphalt or reinforced concrete, 2 inches thick, minimum, or other material as approved by the plan review, Section 2(D).

D. Where Emergency Vehicle Lanes connect to City streets or parking lots, adequate clearances and turning radii shall be provided. All proposed plans shall have City Engineer and Fire code official approval.

Section 3. Parking Prohibited: Except when necessary to avoid conflict with other traffic or in compliance with the direction of a police officer or fire official or traffic control sign, signal, or device, no person shall:

A. Stop, stand or park a vehicle, whether occupied or not at any place where official emergency vehicle lane signs are posted, except:

1. Momentarily to pick-up or discharge a passenger or passengers; or

2. Delivery vehicle for the purpose of and while actually engaged in loading or unloading.

Section 4. Emergency Vehicle Lanes as Part of Driveways and or Parking Areas. The Fire code official may require that areas specified for use as driveways or private thoroughfares shall not be used for parking. These areas when specified, shall be marked as identified in Section 2(B).

Exhibit A-1

Section 5. Existing Buildings. When the Fire code official determines that inaccessibility for fire apparatus exists around existing buildings or structures, then he may require emergency vehicle lanes to be constructed and maintained.

Section 6. Enforcement. It shall be the duty of the Puyallup Police and Fire Code Official and/or their authorized designee(s) to enforce this Section.

Section 7. Penalties. A violation of any provision of this Section shall constitute a Class 3 civil infraction as defined in Chapter 1.02 PMC.

Section 8. Impound of Illegally Parked Vehicles. In addition to the penalties provided for in Section 7, any vehicle improperly parked in violation of any of the provisions of this Section shall be subject to impound.

(Ord. 2801 § 1, 2004; Ord. 2604 § 1, 1999; Ord. 2548 § 1, 1998; Ord. 2156 § 1, 1988; Ord. 1986 § 1, 1983).

## 16.04.016 Permits and fees.

In addition to the International Fire Code, the following provisions shall apply to permit requirements:

(1) Permit Fees. All fees for permits or other approvals required in this title shall be as currently exist or as may be amended from time to time in writing by Executive Order of the City Manager. Copies of all fee schedules, and any subsequent amendments thereto, shall be maintained and available for public review at the offices of the fire chief and the development services department during regular business hours.

(2) Permit Inspection Fee. An inspection fee, the hourly rate for which shall be established by resolution of the City Council and which shall be in addition to any permit fee required, shall be charged for any inspection requiring more than one hour. The inspection fees shall be assessed in 30 minute increments with the first 30 minutes or any portion thereof being charged the full hourly rate.

(3) Revocation. The fire code official is authorized to suspend or revoke a permit when it is determined after a hearing by the fire code official that the permittee failed, refused or neglected to pay required permit fees within 90 days following mailing of an invoice to the permittee requiring payment. Mailing shall be accomplished by First Class Mail of the U.S. Postal Service.

(Ord. 2801 § 1, 2004; Ord. 2604 § 2, 1999; Ord. 2015 § 1, 1984).

## 16.04.020 Conflict with international codes.

*Repealed by Ord. 2962.* (Ord. 2801 § 1, 2004; Ord. 1951 § 3, 1982).

## 16.04.025 Local amendments of International Fire Code.

The International Fire Code adopted by reference in this chapter is hereby amended as follows:

(1) IFC Section 102.7 is amended to read as follows:

102.7 Referenced codes and standards. The codes and standards referenced in this code shall be those that are listed in Chapter 45 (where standards are referenced within the IFC) and such codes and standards shall be considered part of the requirements of this code to the prescribed extent of each such reference as determined or modified by the fire code official. Where differences occur between the provisions of this code and the referenced standards, the provisions of this code shall apply.

Exhibit A-1

(2) IFC Sections 108.3, 109.3 and 111.4 are hereby repealed.

(3) IFC Sections 503.1, 503.1.1, 503.1.2, 503.1.3, 503.2, 503.3 and 503.4 are hereby adopted in the city of Puyallup.

(4) IFC Section 503.1 is amended to read as follows:

503.1 Where required. Fire apparatus access roads shall be provided and maintained in accordance with Sections 503.1.1 through 503.1.3 and Appendix D.

Exception: If a single family residence was legally in existence prior to July 1, 2011, a cumulative square foot addition of not more than 25 percent of the original square footage may be constructed.

503.1.1 Buildings and facilities. Approved fire apparatus access roads shall be provided for every facility, building or portion of a building hereafter constructed or moved into or within the jurisdiction. The fire apparatus access road shall comply with the requirements of this section and shall extend to within 150 feet of all portions of the facility and all portions of the exterior walls of the first story of the building as measured by an approved route around the exterior of the building or facility.

Exception: The fire code official is authorized to increase the dimension of 150 feet where:

(a) The building is equipped throughout with an approved automatic sprinkler system installed in accordance with Section 903.3.1.1, 903.3.1.2 or 903.3.1.3.

(b) Fire apparatus access roads cannot be installed because of location on property, topography, waterways, nonnegotiable grades or other similar conditions, and an approved alternative means of fire protection is provided.

(c) There are not more than two Group R-3 or Group U occupancies.

503.1.2 Additional access. The fire code official is authorized to require more than one fire apparatus access road based on the potential for impairment of a single road by vehicle congestion, condition of terrain, climatic conditions or other factors that could limit access.

503.1.3 High-piled storage. Fire department vehicle access to buildings used for high-piled combustible storage shall comply with the applicable provisions of Chapter 23.

503.2 Specifications. Fire apparatus access roads shall be installed and arranged in accordance with Sections 503.2.1 through 503.2.8.

503.2.1 Dimensions. Fire apparatus access roads shall have an unobstructed width of not less than 20 feet and an unobstructed vertical clearance of not less than 13 feet 6 inches.

Exception: The fire code official shall have the authority to approve a decrease in the minimum access width.

503.2.2 Authority. The fire code official shall have the authority to require an increase in the minimum access widths where they are inadequate for fire or rescue operations.

(5) IFC Sections 503.2.3, 503.2.4, and 503.2.7 are amended to read as follows:

Exhibit A-1

503.2.3 Surface. Fire apparatus access roads shall be designed and maintained to support the imposed loads of fire apparatus and shall be surfaced so as to provide all-weather driving capabilities and meet City of Puyallup road design standards.

503.2.4 Turning radius. The required turning radius of a fire apparatus access road shall be determined by the fire code official and City of Puyallup road design standards.

503.2.5 Dead ends. Dead-end fire apparatus access roads in excess of 150 feet in length shall be provided with an approved area for turning around fire apparatus.

503.2.7 Grade. The grade of the fire apparatus access road shall be within the limits established by the fire code official based on the fire department's apparatus, Appendix D, and City of Puyallup road design standards.

503.2.8 Angles of approach and departure. The angles of approach and departure for fire apparatus access roads shall be within the limits established by the fire code official based on the fire department's apparatus.

503.3 Markings. Where required by the fire code official, approved signs or other approved notices or markings that include the words NO PARKING-FIRE LANE shall be provided for fire apparatus access roads to identify such roads or prohibit the obstruction thereof. The means by which fire lanes are designated shall be maintained in a clean and legible condition at all times and be replaced or repaired when necessary to provide adequate visibility.

503.4 Obstruction of fire apparatus access roads. Fire apparatus access roads shall not be obstructed in any manner, including the parking of vehicles. The minimum widths and clearances established in Section 503.2.1 shall be maintained at all times.

(6) IFC Section 503.6 is amended to read as follows:

503.6 Security gates. The installation of security gates across a fire apparatus access road shall be approved by the fire chief. Where security gates are installed, they shall have an approved means of emergency operation. The security gates and the emergency operation shall be maintained operational at all times. Electric gate operators, where provided, shall be listed in accordance with UL 325. Gates intended for automatic operations shall be designed, constructed and installed to comply with the requirements of ASTM F 2200. The main entry gate and any other electronic gate of all residential, commercial, or industrial developments shall be constructed in a manner which includes the installation of a key controlled device and an emergency vehicle preemption system to open all such gates to allow for immediate entry of fire apparatus into the development. Such system shall be a priority control system that employs data-encoded infrared communication to identify the fire apparatus vehicle. The type of system to be installed must be compatible with the traffic signal priority control system used by the city of Puyallup. The design and final installation of the system must be approved by the city of Puyallup. A security gate serving one or two single family dwellings or any non-electronic gate shall be provided with a key controlled device approved by the fire chief. All gates will require a review by the traffic division. When required, a plan shall be submitted to the fire code official and traffic division to determine the area required for the stacking of vehicles and other vehicle turning maneuvers.

(7) IFC Section 505.1 is amended to read as follows:

505.1 Address identification: New and existing buildings shall have approved address numbers, building numbers or approved building identification placed in a position that is plainly legible and visible from the street or road fronting the property. These numbers shall contrast with their background. Address numbers shall be Arabic numerals or alphabet letters. Numbers shall be a minimum of 6 inches high with a minimum stroke width of 0.5 inch (12.7 mm) for buildings that are within 50 feet of the street, 12 inches high for buildings that are 51-100 feet from the street, and 18 inches high for

Exhibit A-1

buildings that are over 100 feet from the street. Where access is by means of a private road or driveway and the building cannot be viewed from the public way, a monument, pole or other sign or means shall be used to identify the structure.

(8) IFC Section 507.1 is amended to read as follows:

507.1. Required water supply. An approved water supply capable of supplying the required fire flow for fire protection shall be provided to premises upon which facilities, buildings or portions of buildings are hereafter constructed or moved into or within the jurisdiction.

Exception: If a single family residence was legally in existence prior to July 1, 2011, a cumulative square foot addition of not more than 25 percent of the original square footage may be constructed.

(Ord. 3043 § 2, 2013; Ord. 2979 § 2, 2011; Ord. 2962 § 4, 2010).

## 16.04.030 Violation – Penalty.

(1) It is unlawful for any person or entity to violate any provision of this chapter, or any code adopted herein, or to erect, construct, enlarge, alter, repair, move, improve, remove, change, convert, demolish, equip, use, occupy or maintain any building, structure or equipment, or to use any land contrary to, or in violation of, any of the provisions of this chapter, or any code adopted herein.

(2) A violation of the provisions of this chapter shall be a Class 1 civil infraction pursuant to Chapter 1.02 PMC. Notwithstanding the foregoing, a violation of a stop work order, a notice of violation or use of unsafe structures or equipment after notice shall be a misdemeanor.

(3) Each violation of the provisions of this chapter or the International Fire Code shall constitute a separate infraction or offense.

(4) Each day that a particular violation exists shall constitute a separate infraction or offense.

(5) In addition to fines or penalties, the violator shall, as a condition of continued occupation of the property or structure in violation of this chapter or the International Fire Code, immediately abate the violation. Furthermore, a violator shall be liable for all costs and expenses occasioned by such violation. (Ord. 2962 § 5, 2010).

---

[1]Prior legislation: Ords. 1370, 1460 and 1598.

**The Puyallup Municipal Code is current through Ordinance 3129, passed November 22, 2016.**

Disclaimer: The City Clerk's Office has the official version of the Puyallup Municipal Code. Users should contact the City Clerk's Office for ordinances passed subsequent to the ordinance cited above.

City Website: http://www.cityofpuyallup.org/ (http://www.cityofpuyallup.org/)

City Telephone: (253) 841-5480

Code Publishing Company (http://www.codepublishing.com/)

Exhibit A-1

Dead-end Access Roads:

Some access roads at this project are classified as dead-end fire apparatus access roads. Therefore, Table 1 shown below specifies the turnaround provisions in accordance with Table D103.4 from the IFC. This is because when a fire truck enters a dead-end road, it should park facing the escape route just in case sudden evacuation is needed the truck will escape forward as it is not allowed for the truck to reverse at long dead-end roads.

| TABLE D103.4 REQUIREMENTS FOR DEAD-END FIRE APPARATUS ACCESS ROADS | | |
|---|---|---|
| LENGTH (feet) | WIDTH (feet) | TURNAROUNDS REQUIRED |
| 0—150 | 20 | None required |
| 151—500 | 20 | 120-foot Hammerhead, 60-foot "Y" or 96-foot-diameter cul-de-sac in accordance with Figure D103.1 |
| 501—750 | 26 | 120-foot Hammerhead, 60-foot "Y" or 96-foot-diameter cul-de-sac in accordance with Figure D103.1 |
| Over 750 | Special approval required | |

**Table 1: Requirements for Dead-end Fire Apparatus Access Roads, IFC 2006**



**Figure 2: Dead End Fire Apparatus Access Road Turnaround, IFC 2006**

4

Exhibit A-1

# Exhibit 3

Exhibit A-1



### Owner Policy of Title Insurance Transmittal Letter

Date: June 21, 2013

JBRF Limited Liability Company, a Texas limited liability company
132 Brook Stone
Cibolo, TX  78108

RE: Order No.:          12806NC
        Buyer/Borrower(s): JBRF Limited Liability Company, a Texas limited liability company
        Seller (s):          Paul Houston and Vickie Houston
        Property Address: 2661 N. Graytown Road, Converse, TX 78109

In connection with the above transaction, we enclose your Owner Policy of Title Insurance.

It has been a pleasure to serve you.  If we may assist you in the future, please let us know.

Trinity Title of Texas, LLC

By: _Sandra M. Garcia_
**Authorized Officer or Agent**

**CORPORATE OFFICE**
3522 Paesano's Parkway Suite 200, San Antonio, TX 78231   Ph: (210) 496.2223   Fax: (210) 496.2228
www.trinitytitlesa.com

MHGarcia.2P88

Exhibit A-1

# OWNER'S POLICY OF TITLE INSURANCE

Issued by OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY



Policy Number: **TO-08053685**     File Number: 12806NC

Any notice of claim and any other notice or statement in writing required to be given the Company under this Policy must be given to the Company at the address shown in Section 18 of the Conditions.

## COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, a Minnesota corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from:
   (a) A defect in the Title caused by:
      (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii) failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
      (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v) a document executed under a falsified, expired or otherwise invalid power of attorney;
      (vi) a document not properly filed, recorded or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
   (d) Any statutory or constitutional mechanic's, contractor's, or materialman's lien for labor or materials having its inception on or before Date of Policy.
3. Lack of good and indefeasible Title.
4. No right of access to and from the Land.
5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to
   (a) the occupancy, use or enjoyment of the Land;
   (b) the character, dimensions or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection
      if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.
6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

Issued through the Office of:
Policy Issuer:
**TRINITY TITLE OF TEXAS, LLC**
**3522 PAESANO'S PARKWAY**
**SUITE 200**
**SAN ANTONIO, TX 78231**
**PHONE: 210-496-2223**

_____
Authorized Countersignatory

OHT Form T-1 pg. 1
Owner's Policy of Title Insurance T-1
Effective 2-1-2010

**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**
*A Stock Company*
*400 Second Avenue South, Minneapolis, Minnesota 55401*
*(612) 371-1111*

By _____ President

Attest _____ Secretary

Kibarra.zppa

# OWNER'S POLICY OF TITLE INSURANCE

Issued by

## *Old Republic National Title Insurance Company*

### SCHEDULE A

Name and Address of Title Insurance Company:
**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**
400 Second Avenue South, Minneapolis, 55401

File No.: **12806NC**                                        Policy No.: **TO-08053685**

Address for Reference only: 2661 N. Graytown Road, Converse, TX 78109

Amount of Insurance: **$465,000.00**                              Premium: **$3,210.80**

Date of Policy: **April 22, 2013, at 03:33 pm**

1.      Name of Insured:  **JBRF LIMITED LIABILITY COMPANY, A TEXAS LIMITED LIABILITY COMPANY**

2.      The estate or interest in the Land that is insured by this policy is:  Fee Simple as to Tract I ; Easement as to Tract III

3.      Title is insured as vested in:  **JBRF LIMITED LIABILITY COMPANY, A TEXAS LIMITED LIABILITY COMPANY**

4.      The Land referred to in this policy is described as follows:

        **TRACT I**

        See Exhibit "A" attached hereto and incorporated by reference.

        **TRACT III**

        See Exhibit "B" attached hereto and incorporated by reference.

Hibarra.xro0

Exhibit A-1



**SHERWOOD SURVEYING**
RESIDENTIAL I COMMERCIAL

6477 FM 311
PO BOX 992
SPRING BRANCH, TX 78070
830.228.5446 PH  I  830.885.2170 FX
WWW.MSENGR.COM

EXHIBIT A

115.287 ACRE TRACT
13RPLSM014.DWG

FN NO. 13RPLSM014
APRIL 2, 2013
JOB NO. 13RPLSM014

## FIELDNOTE DESCRIPTION

BEING A 115.287 ACRE TRACT OF LAND, SITUATED IN THE JOHN ISHAM SURVEY NO. 27, ABSTRACT 365, COUNTY BLOCK 5108, BEXAR COUNTY, TEXAS, BEING THE SAME TRACT CALLED 115.414 ACRES DESCRIBED IN VOLUME 8166, PAGE 968, OFFICIAL PUBLIC RECORDS, BEXAR COUNTY, TEXAS, SAID 115.287 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A FOUND ½" IRON ROD SITUATED ON THE SOUTHEASTERLY LINE OF THAT CERTAIN 129.8 ACRE TRACT CONVEYED TO HELEN RAKOWITZ, VOLUME 1741, PAGE 299, OFFICIAL PUBLIC RECORDS, BEXAR COUNTY, TEXAS, MARKING THE NORTHERLY CORNER OF SAID 115.414 ACRE TRACT, THE WESTERLY CORNER OF THAT CERTAIN 67.18 ACRE TRACT CONVEYED TO DOUGLAS J. HEDRICK, VOLUME 13693, PAGE 1209, OFFICIAL PUBLIC RECORDS, BEXAR COUNTY, TEXAS, AND NORTHERLY CORNER AND POINT OF BEGINNING OF THIS TRACT;

THENCE, S 60° 33' 19" E, ALONG THE COMMON SOUTHWESTERLY LINE OF SAID 67.18, PARTIALLY ALONG THE SOUTHWESTERLY LINE OF THAT CERTAIN 150 ACRE TRACT CONVEYED TO ROBERT LEE SCHULZE, ET AL, VOLUME 11595, PAGE 922, OFFICIAL PUBLIC RECORDS, BEXAR COUNTY, TEXAS, AND THE NORTHEASTERLY LINE OF SAID 115.414 ACRE TRACT, A DISTANCE OF 1809.94 FEET TO A FOUND ½" IRON ROD MARKING THE NORTHERLY CORNER OF THAT CERTAIN 100.08 ACRE TRACT CONVEYED TO RODNEY K. MANN, LIVING TRUST, VOLUME 15786, PAGE 899, OFFICIAL PUBLIC RECORDS, BEXAR COUNTY, TEXAS, THE EASTERLY CORNER OF SAID 115.414 ACRE TRACT AND THE EASTERLY CORNER OF THIS TRACT;

THENCE, S 29° 31' 56" W, ALONG THE COMMON NORTHWESTERLY LINE OF SAID 100.08 ACRE TRACT, THE NORTHWESTERLY LINE OF THAT CERTAIN 43.580 ACRE TRACT CONVEYED TO MERLE D. TAYLOR, VOLUME 11047, PAGE 1223, OFFICIAL PUBLIC RECORDS, BEXAR COUNTY, TEXAS, AND THE SOUTHEASTERLY LINE OF SAID 115.414 ACRE TRACT, A DISTANCE OF 2772.23 FEET TO A ½" IRON ROD WITH CAP "BLS 2024" SITUATED ON THE NORTHEASTERLY LINE OF THAT CERTAIN 66.567 ACRE TRACT CONVEYED TO RODNEY K. MANN LIVING TRUST, VOLUME 15786, PAGE 903, OFFICIAL PUBLIC RECORDS, BEXAR COUNTY, TEXAS, MARKING THE WESTERLY CORNER OF SAID 43.580 ACRE TRACT, THE SOUTHERLY CORNER

Exhibit A-1

OF SAID 115.414 ACRE TRACT AND THE SOUTHERLY CORNER OF THIS TRACT;

THENCE, ALONG THE SOUTHWESTERLY LINE OF SAID 115.414 ACRE TRACT, THE FOLLOWING COURSES:

N 60° 47' 07" W, COMMON WITH THE NORTHERLY LINE OF SAID 66.567 ACRE TRACT, A DISTANCE OF 1121.65 TO A FOUND ¼" IRON ROD WITH CAP "BLS 2024" MARKING THE NORTHERLY CORNER OF SAID 66.567 ACRE TRACT AND THE EASTERLY CORNER OF THAT CERTAIN GERALD J. RIPPS TRACT REFERENCED IN VOLUME 14308, PAGE 1433, OFFICIAL PUBLIC RECORDS, BEXAR COUNTY, TEXAS;

N 60° 36' 08" W, COMMON WITH THE NORTHERLY LINE OF SAID GERALD J. RIPPS TRACT, A DISTANCE OF 685.85 FEET TO A FOUND FENCE CORNER POST SITUATED ON THE SOUTHEASTERLY LINE OF THAT CERTAIN 129.8 ACRE TRACT CONVEYED TO JOHN A. AND JULIA RAKOWITZ, VOLUME 1747, PAGE 122, OFFICIAL PUBLIC RECORDS, BEXAR COUNTY, TEXAS, MARKING THE WESTERLY CORNER OF SAID 115.414 ACRE TRACT AND THE WESTERLY CORNER OF THIS TRACT;

THENCE, ALONG THE NORTHWESTERLY LINE OF SAID 115.414 ACRE TRACT, THE FOLLOWING COURSES:

N 29° 24' 52" E, COMMON WITH THE SOUTHEASTERLY LINE OF SAID 129.8 ACRE TRACT, A DISTANCE OF 1209.24 FEET TO A FOUND ¼" IRON ROD MARKING THE EASTERLY CORNER OF SAID 129.8 ACRE TRACT AND THE SOUTHERLY CORNER OF THAT CERTAIN 90.099 ACRE TRACT CONVEYED TO ETHEL R. RAKOWITZ RECHNER, VOLUME 7779, PAGE 836, OFFICIAL PUBLIC RECORDS, BEXAR COUNTY, TEXAS, MARKING A CORNER OF THIS TRACT;

N 29° 31' 59" E, COMMON WITH THE SOUTHEASTERLY LINE OF SAID 90.099 ACRE TRACT AND THE SOUTHEASTERLY LINE OF THE ABOVE REFERENCED 129.8 ACRE TRACT, A DISTANCE OF 1568.05 FEET TO THE POINT OF BEGINNING CONTAINING AN AREA OF 115.287 ACRES OF LAND, MORE OR LESS.

A SURVEY EXHIBIT WAS PREPARED ON THIS SAME DATE. BASIS OF BEARING IS NAD 83 TEXAS STATE PLANE COORDINATES, SOUTH CENTRAL ZONE.

Exhibit A-1

I, RICHARD A. GOODWIN, A REGISTERED PROFESSIONAL LAND SURVEYOR, DO HEREBY CERTIFY THAT THE PROPERTY DESCRIBED HEREIN WAS DETERMINED FROM A SURVEY MADE ON THE GROUND UNDER MY DIRECTION AND SUPERVISION.

SHERWOOD SURVEYING, LLC
P.O. BOX 992
SPRING BRANCH, TEXAS 78070

RICHARD A. GOODWIN     DATE
R.P.L.S. #4069 STATE OF TEXAS



Exhibit A-1

# EXHIBIT "B"

## H. A. KUHLLEN SURVEY COMPANY

Boundary      Subdivision      Oil Wells      Construction

### FIELD NOTES

Field notes of a 20.00 foot wide Ingress and Egress and Water and Water Easement situated in Bexar County, Texas out of the John Tahue Survey No. 27, Abstract 385, County Block 5108 and being over that 98.260 acre tract of land conveyed to Claude F. Friesenhahn by deed recorded in Volume 8071, Page 585 of the Deed Records of Bexar County, Texas and being more particularly described by metes and bounds as follows:

Beginning at a point in the southwest line of Grayburn Road at the north corner of this easement; being S 60 deg. 28' 26" E. 331.09 feet from an iron pin found at the north corner of said 98.260 acre tract, said point of beginning also being N 60 deg. 28' 26" E. 2808.38 feet from the intersection of the southwest line of Grayburn Road with a cut off line at the southeast line of Green Road.

Thence S 60 deg. 28' 26" E. 20.00 feet, along the southwest line of Grayburn Road to a right angle corner of this easement;

Thence along the southeast line of this easement, as follows:
S 20 deg. 32' 52" W. 1137.91 feet to an angle point,
S 39 deg. 55' 23" W. 188.27 feet to an angle point,
S 29 deg. 17' 37" W. 1300.01 feet to a point in the southwest line of said 98.260 acre tract, being the northeast line of a 114 acre tract conveyed to William Schwenn by deed recorded in Volume 808, Page 468 of the Deed Records of Bexar County, Texas, being the south corner of this easement.

Thence N 60 deg. 31' 00" W. 20.00 feet, along the southwest line of said 98.260 acre tract, being the northeast line of said 114 acre tract to a fence corner at the west corner of this easement.

Thence along the northwest line of this easement, as follows:
N 29 deg. 17' 37" E. 1302.72 feet an angle point,
N 39 deg. 55' 23" E. 185.14 feet an angle point,
N 20 deg. 32' 52" E. 1135.08 feet to the place of beginning and covering 1.241 acres of land according to a survey made on the ground.

Job No. 318-93

Surveyed August 31, 1993

HENRY A. KUHLEN
REGISTERED PROFESSIONAL LAND SURVEYOR
NO. 4020

TRACT III

Exhibit A-1

# OWNER'S POLICY OF TITLE INSURANCE
#### Issued by
## *Old Republic National Title Insurance Company*
### SCHEDULE B

File No.: **12806NC**                                                    Policy No.: **TO-08053685**

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of the terms and conditions of leases and easements, if any, shown in Schedule A, and the following matters:

1.  The following restrictive covenants of record itemized below (the Company must either insert specific recording data or delete this exception):

    Item No 1, Schedule B, is deleted in its entirety.

2.  ~~Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.~~

3.  Homestead or community property or survivorship rights, if any, of any spouse of any Insured.

4.  Any titles or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

    a.  to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

    b.  to lands beyond the line of harbor or bulkhead lines as established or changed by any government, or

    c.  to filled-in lands, or artificial islands, or

    d.  to statutory water rights, including riparian rights, or

    e.  to the area extending from the line of mean low tide to the line of vegetation, or the right of access to that area or easement along and across that area.

5.  Standby fees, taxes and assessments by any taxing authority for the year **2013**, and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership, but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, *Texas Tax Code*, or because of improvements not assessed for a previous tax year.

6.  The following matters and all terms of the documents creating or offering evidence of the matters (The Company must insert matters or delete this exception.):

    a.  Rights of parties in possession.

    b.  United Gas Pipe Line Company Easements recorded in Volume 1793, Page 406 and Volume 1801, Page 512, Deed Records, assigned in Volume 5905, Page 447, Deed Records, Bexar County, Texas.

    c.  Electric Easement recorded in Volume 11281, Page 947, Real Property Records, Bexar County, Texas.

    d.  Permanent and Temporary Construction Easement recorded in Volume 13615, Page 640, Real Property Records, Bexar County, Texas.

Exhibit A-1

Continuation of Schedule B                                                     Policy No.  TO-08053685

e.   20' Ingress and Egress easement described in Volume 6419, Page 111, Real Property Records, Bexar County, Texas.

f.   Oil, Gas and Mineral Leases recorded in Volume 3851, Page 596 and Volume 7281, Page 380, Deed Records, Bexar County, Texas.

g.   All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not.  There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

h.   Visible and apparent easements over and across subject property.

i.   Any portion of subject property lying within the boundaries of a public or private roadway or highway.

j.   Survey prepared by SHERWOOD SURVEYING, L.L.C. dated April 1, 2013, is approved subject to:

OVERHEAD ELECTRIC
GRAVEL ROAD INSETS 20' WIDE INGRESS-EGRESS & WATER EASEMENT

Countersigned
Trinity Title of Texas, LLC

By    _Ghuy Plrkuner_

FORM T-1:  Owner's Policy of Title Insurance                                        Page 3

Hibarra.zpss

Exhibit A-1

## COVERED RISKS continued

7.   The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.
8.   Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.
9.   Title being vested other than as stated in Schedule A or being defective:
    (a)   as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency or similar creditors' rights laws; or
    (b)   because the instrument of transfer vesting Title as shown in Schedule A constitutes a preferential transfer under federal bankruptcy, state insolvency or similar creditors' rights laws by reason of its recording in the Public Records:
       (i)   to be timely, or
       (ii)   to impart notice of its existence to a purchaser for value or a judgment or lien creditor.
10.   Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 9 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.
The Company will also pay the costs, attorneys' fees and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses that arise by reason of:
1.   (a)   Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to:
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)   the character, dimensions or location of any improvement erected on the Land;
    (iii)   subdivision of land; or
    (iv)   environmental protection;
    or the effect of any violation of these laws, ordinances or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b)   Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.   Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.   Defects, liens, encumbrances, adverse claims or other matters:
    (a)   created, suffered, assumed or agreed to by the Insured Claimant;
    (b)   not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)   resulting in no loss or damage to the Insured Claimant;
    (d)   attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e)   resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4.   Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is:
    (a)   a fraudulent conveyance or fraudulent transfer; or
    (b)   a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5.   Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.
6.   The refusal of any person to purchase, lease or lend money on the estate or interest covered hereby in the land described in Schedule A because of Unmarketable Title.

## CONDITIONS

1.   *Definition of Terms.*
The following terms when used in this policy mean:
    (a)   "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 and 11 of these Conditions.
    (b)   "Date of Policy": The date designated as "Date of Policy" in Schedule A.
    (c)   "Entity": A corporation, partnership, trust, limited liability company or other similar legal entity.
    (d)   "Insured": The Insured named in Schedule A.
       (i)   The term "Insured" also includes:
         (A)   successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives or next of kin;
         (B)   successors to an Insured by dissolution, merger, consolidation, distribution or reorganization;
         (C)   successors to an Insured by its conversion to another kind of Entity;
         (D)   a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title;
           (1)   If the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

Exhibit A-1

## CONDITIONS continued

(2) If the grantee wholly owns the named Insured,
(3) If the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or
(4) If the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.

(ii) With regard to (A), (B), (C) and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.

(e) "Insured Claimant": an Insured claiming loss or damage.
(f) "Knowledge" or "Known": actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.
(g) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.
(h) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.
(i) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.
(j) "Title": The estate or interest described in Schedule A.
(k) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease or lend if there is a contractual condition requiring the delivery of marketable title.

### 2. Continuation of Insurance.
The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

### 3. Notice of Claim to be Given by Insured Claimant.
The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) below of these below, or (ii) in case Knowledge shall come to an Insured hereunder of any claim of

title or interest that is adverse to the Title, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

When, after the Date of the Policy, the Insured notifies the Company as required herein of a lien, encumbrance, adverse claim or other defect in Title insured by this policy that is not excluded or excepted from the coverage of this policy, the Company shall promptly investigate the charge to determine whether the lien, encumbrance, adverse claim or defect or other matter is valid and not barred by law or statute. The Company shall notify the Insured in writing, within a reasonable time, of its determination as to the validity or invalidity of the Insured's claim or charge under the policy. If the Company concludes that the lien, encumbrance, adverse claim or defect is not covered by this policy, or was otherwise addressed in the closing of the transaction in connection with which this policy was issued, the Company shall specifically advise the Insured of the reasons or its determination. If the Company concludes that the lien, encumbrance, adverse claim or defect is valid, the Company shall take one of the following actions:
(i) institute the necessary proceedings to clear the lien, encumbrance, adverse claim or defect from the Title as insured;
(ii) indemnify the Insured as provided in this policy;
(iii) upon payment of appropriate premium and charges therefore, issue to the Insured Claimant or to a subsequent Owner, mortgagee or holder of the estate or interest in the Land insured by this policy, a policy of title insurance without exception for the lien, encumbrance, adverse claim or defect, said policy to be in an amount equal to the current value of the Land or, if a mortgagee policy, the amount of the loan;
(iv) indemnify another title insurance company in connection with its issuance of a policy(ies) of title insurance without exception for the lien, encumbrance, adverse claim or defect;
(v) secure a release or other document discharging the lien, encumbrance, adverse claim or defect; or
(vi) undertake a combination of (i) through (v) herein.

### 4. Proof of Loss.
In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

5.  *Defense and Prosecution of Actions.*

   (a)  Upon written request by the Insured, and subject to the options contained in Sections 3 and 7 of these Conditions, the Company, at its own cost and with out unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

   (b)  The Company shall have the right, in addition to the options contained in Sections 3 and 7, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this sub section, it must do so diligently.

   (c)  Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction and it expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

6.  *Duty of Insured Claimant to Cooperate.*

   (a)  In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

   (b)  The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

7.  *Options to Pay or Otherwise Settle Claims; Termination of Liability.*

   In case of a claim under this policy, the Company shall have the following additional options:

   (a)  To Pay or Tender Payment of the Amount of Insurance. To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay. Upon the exercise by the Company of this option, all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in this subsection, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

   (b)  To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

      (i)  to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

      (ii)  to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

   Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

HIbarra.2P96

Exhibit A-1

8.   *Determination and Extent of Liability.*
   This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.
   (a)  The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of:
      (i)   the Amount of Insurance; or
      (ii)  the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.
   (b)  If the Company pursues its rights under Sections 3 or 5 and is unsuccessful in establishing the Title, as insured,
      (i)   the Amount of Insurance shall be increased by 10%, and
      (ii)  the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.
   (c)  In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

9.   *Limitation of Liability.*
   (a)  If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, all as insured, or takes action in accordance with Section 3 or 7, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.
   (b)  In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.
   (c)  The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

10.  *Reduction of Insurance; Reduction or Termination of Liability.*
   All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment.

11.  *Liability Noncumulative.*
   The Amount of Insurance shall be reduced by any amount the Company pays under any policy insuring a Mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject or which is executed by an Insured after Date of Policy and which is a charge or lien on the Title, and the amount so paid shall be deemed a payment to the Insured under this policy.

12.  *Payment of Loss.*
   When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

13.  *Rights of Recovery Upon Payment or Settlement.*
   (a)  Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies. If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.
   (b)  The Company's right of subrogation includes the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

14.  *Arbitration.*
   Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity). All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

15.  *Liability Limited to This Policy; Policy Entire Contract.*
   (a)  This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.
   (b)  Any claim of loss or damage that arises out of the status of the Title or by any action asserting such claim shall be restricted to this policy.
   (c)  Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.
   (d)  Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not
      (i)   modify any of the terms and provisions of the policy,

Exhibit A-1

(ii)   modify any prior endorsement,
(iii)  extend the Date of Policy, or
(iv)   increase the Amount of Insurance.

Each Commitment, endorsement or other form, or provision in the Schedules to this policy that refers to a term defined in Section 1 of the Conditions shall be deemed to refer to the term regardless of whether the term is capitalized in the Commitment, endorsement or other form, or Schedule. Each Commitment, endorsement or other form, or provision in the Schedules that refers to the Conditions and Stipulations shall be deemed to refer to the Conditions of this policy.

16.   *Severability.*

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, and all other provisions shall remain in full force and effect.

17.   *Choice of Law; Forum.*

(a)   Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined for in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located. Therefore, the court or an arbitrator

shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title that are adverse to the Insured and in interpreting and enforcing the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b)   Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

18.   *Notices, Where Sent.*

Any notice of claim and any other notice or statement in writing required to be given the Company under this policy must be given to the Company at 400 Second Avenue South, Minneapolis, Minnesota 55401-2499.

# FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL: 1-888-678-1700

## NOTE: THIS POLICY VALID ONLY IF SCHEDULES A AND B ARE ATTACHED

Hibarra.2P88

Exhibit A-1

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|
| To obtain information or make a complaint: | Para obtener informacion o para someter una queja: |
| You may contact Trinity Title of Texas, LLC, 210-496-2223. | Puede cominicarse con su Trinity Title of Texas, LLC, 210-496-2223. |
| You may call Old Republic National Title Insurance Company's toll-free telephone number for information or to make a complaint at: | Usted puede llamar al numero de telefono gratis de Old Republic National Title Insurance Company para informacion o para someter una queja al: |

### 1-888-678-1700

| You may also write to Old Republic National Title Insurance Company at: | Usted tambien puede escribir a Old Republic National Title Insurance Company: |
|---|---|
| 400 Second Avenue South<br>Minneapolis, Minnesota 55401<br>Attn:  Claims Department | 400 Second Avenue South<br>Minneapolis, Minnesota 55401<br>Attn:  Claims Department |
| You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at: | Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companies, coberturas, derechos o quejas al: |

### 1-800-252-3439

| You may write the Texas Department of Insurance: | Puede escribir al Departament de Seguros de Texas: |
|---|---|
| P. O. Box 149104<br>Austin, TX 78714-9104<br>Fax:  (512) 475-1771<br>Web:  http://www.tdi.state.tx.us<br>E-mail:  ConsumerProtection@tdi.state.tx.us | P. O. Box 149104<br>Austin, TX 78714-9104<br>Fax:  (512) 475-1771<br>Web:  http://www.tdi.state.tx.us<br>E-mail:  ConsumerProtection@tdi.state.tx.us |

**PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim you should contact the Old Republic National Title Insurance Company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY**
This notice is for information only and does not become a part or condition of the attached document.

**DISPUTAS SOBRE PRIMAS O RECLAMOS:**
Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con Old Republic National Title Insurance Company primero.  Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:**  Este aviso es solo para proposito de information y no se convierte en parte o condicion del documento adjunto.

Hibarra.2906

Exhibit A-1

# Exhibit 1

15

## CHRONOLOGY/SUMMARY OF EASEMENT CREATION AND CONVEYANCES

Key:      unity of ownership prior to separation (twice)
- Hedrick Tract history
- JBRF Tract history
- Easement conveyances

| date | Vol/Page | grantor | grantee | language |
|---|---|---|---|---|
| 11/05/1901 | 168/550 | Leon Rackowitz | Tom Mahula | 269 acre tract (155 acre tract + 114 acre tract) conveyed... to have and to hold *together with all and singular the rights and appurtenances thereto in anywise belonging* unto the said Tom Mahula, heirs and assigns... |
| 11/08/1902 | 208/461 | Tom/Caroline Mahula | William Schwenn | convey... 114 acre tract...to have and to hold *together with all and singular the rights and appurtenances thereto in anywise belonging* unto the said William Schwenn... |
| 11/08/1902 | 208/461 | Tom/Caroline Mahula | William Schwenn | ...convey a strip of land 20 feet wide out of that tract of land containing 155 acres... *together with all and singular the rights and appurtenances thereto in anywise belonging* unto the said William Schwenn, his heirs and assigns forever... |
| 11/15/1902 | 210/622 | Tom/Caroline Mahula | Hugo Meurin | ...convey... 155 acres ...and except a strip of land 20 feet wide ... is retained for an outlet or road... |
| 02/28/1910 | 337/68 | Hugo Meurin | William Schneider | ...convey... 155 acres...and except a strip of 20 feet wide ... is retained for an outlet or road... |
| 11/16/1916 | 498/85 | William/Elisabeth Schneider | Gustav L. Huebner | ...convey all that certain tract or parcel of land lying and being in the County of Bexar and a part of the Islam survey 27, and a part of a 155 acre tract conveyed to William Schneider by Hugo Meurin by his deed dated February 28, 1910 and recorded in the records of Bexar County Texas book 337 page 68.. and 50 acre tract conveyed to us by William Gerth...and 108 acres of land...a strip of land 20 feet in width is however deducted from the above laying along the south west side of the 155 acre tract...which has been conveyed to William Schwenn for road purposes... *together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Gustav Huebner,...* |
| 11/16/1916 | 498/86 | William Schwenn | William/Elisabeth Schneider | ...a strip of land 20 feet wide conveyed for the purpose of giving an outlet to said Converse Road ..*together with all and singular the rights and appurtenances thereto in anywise belonging unto the said W.A. Schneider...* |
| 11/16/1916 | 1053/557 | William/Elisabeth Schneider | William Schwenn | Warranty Deed...and a part of a 155 acre tract of said Survey No. 27, that was conveyed to Schneider by Hugo Meurin...and being a strip of land 20 feet wide...and conveyed for the purpose of a road. |
| 01/18/1944 | 2019/29 | Gus L. Huebner | Alma Huebner (Former wife) | Convey ...[81.71 acre tract and 107.19 acre tract...being a part of a 155 acre tract conveyed...] ..after deducting from the above-described tract of land a strip of land 20 feet in width...conveyed for road purposes.. *together with all and singular the rights and appurtenances thereto in* |

| | | | | |
|---|---|---|---|---|
| | | | | *anywise belonging unto the said Alma Huebner...* |
| 08/14/1948- NOT FILED/RECORDED UNTIL 12/14/1953 ⬤ | 3427/221 | Alma Huebner *(retains Tract 1 and life estate in this tract 2)* | Etta Mae Klug (Alma Huebner's daughter) | [Tract 2]...convey...out of a 188.90 acre tract of land conveyed to Alma Huebner by Gus L. Huebner by deed dated January 18, 1944, recorded in Volume 2019 at page 29...Tract 2...containing 60.00 acres of land, more or less... *TO HAVE AND TO HOLD...together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Etta Mae Klug...*grantee shall have the right to use a lane along the south side of said tract One (1) as an entrance to said sixty-acre tract...(became part of Hedrick/Notzon properties in 2007-8) |
| 08/14/1948 ⬤ | 3427/221 | Alma Huebner *(retains Tract 1 and life estate in this tract 3)* | Sidonia Nitsche (Alma Huebner's daughter) | [Tract 3]...convey...out of a 188.90 acre tract of land conveyed to Alma Huebner by Gus L. Huebner by deed dated January 18, 1944, recorded in Volume 2019 at page 29...Tract 2...containing 60.00 acres of land, more or less... *TO HAVE AND TO HOLD...together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Etta Mae Klug...* (no grant of easement or right to use) |
| 11/06/1950 ⬤ | 2929/63 | Alma Schwenn Huebner, Ferdinand/Amelia Schwenn Huebner, Leroy and Lottie Schwenn, Edna Schwenn, Arno Harlohs, Gilbert/Hertha Harlohs Barthold, Monroe/Ernestine Harlohs, Edgar/Minnie Schwenn Harlohs, Hugo/Lydia Schwenn Mayer, Martin/Paula Schwenn, Max/Alice Schwenn *(interests from estate of Wilhelm/Bertha Schwenn)* | Gustav Schwenn (brother, son of Wilhelm and Bertha) | ...Sell and convey 115 acres being known as lot 6 out of Isham Survey 27, abstract 365 and being a part of a 155 acre tract conveyed by Leon Rackowitz to Tom Mahula by deed in vol. 168 page 550 to William Schwenn by deed in vol 168 Page 550 and same tract conveyed by Tom Mahula to William Schwenn in vol 208 page 462, less part thereof conveyed by William Schwenn to W. A. Schneider on November 16, 1916 recorded in Vol 498 page 86, together with all rights to road conveyed by W.A. Schneider to William Schwenn in deed recorded in vol. 1053 page 557... *together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Gustav Schwenn, his heirs or assigns forever...* |
| 04/24/1951 (FILED/RECORDED 04/24/1951) ⬤ ⬤ | 3003/565 | Alma Huebner | Gustav Schwenn | ...In and for a valuable consideration to me in hand paid by Gus Schwenn and Telka Schwenn, the receipt of which is hereby acknowledged,...have...granted...and conveyed and do grant and convey...Tract 1—a 20'[1] road easement on the 60 acre tract (no. 2)...and a 20' road easement on a 70 acre tract (Tract 1)...(Tract II) and also a strip 20' feet wide...and 1100.95 feet long...And I hereby grant and convey unto the said Gus and Telka Schwenn, their heirs and assigns, the free and uninterrupted use, liberty, privilege and easement of passing in, over and along a certain way across a certain tract of land (60 acre tract)...described as follows..a 20 foot wide easement...and also a strip 20 feet wide...and I hereby grant...a 20 foot roadway easement...the above described right-of-way over and across my land as aforesaid, together with free ingress, |

---

[1] The actual deed language reads:  Tract I – A 20" road easement on the 60 acre tract...

| | | | | |
|---|---|---|---|---|
| | | | | egress and regress, to...their heirs and assigns and his agents, employees and tenants, by foot, wagon, carriages, automobiles and other vehicles, horses, mules and cattle as by them, individually and collectively, shall be necessary or convenient, at all times and season forever, in, upon *and out of* said right-of-way in common with me |
| 01/05/73 | 7033/215 | Alma Huebner | Melrose Nitsche (son/survivor of Sidonia Nitsche) | "...THAT WE, ALMA HUEBNER, a feme sol, owning a life estate in the following described property (1.78 acres out of Sidonia Nitsche conveyance of 1948) |
| 05/06/1977 ⊙ | 8085/365 | Melrose Nitsche (grandson/ executor of estate of Alma Huebner) | Etta Mae Klug | Correction    Warranty    Deed...THAT, WHEREAS, in the will of Alma Huebner, which was probated in Bexar County... in 1973, the north one-half of the following tract of land was devised to Mrs. Sidonia Nitsche and the South one-half of the following tract of lands was devised to Etta Mae Klug Nitsche hereby conveys... all that certain tract of land...containing 35.0 acres, more or less...this conveyance is made subject to all easements, oil leases... *together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantees, their heirs and assigns forever...(total 95 acres to Etta Mae Klug)* |
| 04/21/1977 ⊙ | 8071/855 | Etta Mae Klug (daughter of Alma Schwenn Huebner) | Claude/Anne Friesenhahn | ...95.260 acres tract...as recorded in deed records vol 3427 page 221 and vol 7326 page 196-7...**This conveyance is made and accepted subject to easements, conditions, restrictions and a roadway easement as recorded in the Deed Records...** (later became the Hedrick/Netzon tracts) |
| 09/10/1992 ⊙ | 5443/375 | Claude/Anne Friesenhahn | Prosper/Frances Bronder | [FRIESENHAHNS']    GRANT    to [BRONDER]... a non-exclusive ingress, egress and water pipeline easement, over, upon, across, and under the following described property situated in Bexar County, Texas, as described as follows, to wit:<br><br>A 20.00 foot wide Ingress and Egress and Water Easement situated in Bexar County, Texas out of the John Isham Survey No. 27.. and being over that 95.260 acre tract of land conveyed to Claude F. Friesenhahn by deed.. being more particularly described by metes and bounds in the Exhibit "A", attached hereto and made a part thereof. *[note: Exhibit "A" is the 1992 survey of the 115 acre tract bought by the Bronders, not the 1992 20' easement survey which is shown in subsequent conveyances as a different Exhibit "A"].*<br><br>TO HAVE AND TO HOLD the above described easement, together with all and singular the rights and appurtenances thereunto in anywise belonging unto the said Grantee herein, Grantee's heirs and assigns... |
| 09/11/1992 ⊙ | 5442/234 | Martha Lee Schwenn, Executrix of Estate of Gustav Schwenn, deceased | Prosper/Frances Bronder | A 115.414 acre tract of land.. and being the same tract of land called 114 acres conveyed to William Schwenn by deed records recorded in vol 208 page 462...being more particularly described... |

Exhibit A-1

| | | | | |
|---|---|---|---|---|
| | | | | TOGETHER with a 20 foot wide Ingress and Egress and Water Easement... and being over that 95.260 acre tract of land conveyed to Claude F. Friesenhahn by deed records recorded in vol 8071 page 855... *TO HAVE AND TO HOLD the above described easement, together with all and singular the rights, hereditaments and appurtenances thereunto in anywise belonging unto the said Grantee herein, Grantee's heir or assigns...* This conveyance is made subject to any and all restrictions, easements, setback lines, covenants, conditions, reservations, terms and provisions of record affecting the property herein conveyed. |
| 05/12/1995 | 6419/111 | Prosper Bronder | Paul Houston | Warranty Deed for 1 acre tract of land cut of 115.414 acre tract together with a 20 foot easement.. This conveyance, however, is made and accepted subject to the following matters, to the extent same are in effect at this time:  any and all restrictions, covenants, assessments, reservations...conditions, and easements, if any, relating to the hereinabove described property, but only to the extent they are still effect and shown of records in the herein above-mentioned County and State or to the extent they are apparent upon reasonable inspection of the property; and subject to all zoning laws, regulations and ordinances of municipal and/or government authorities, if any, but only to the extent they are still in effect and relating to the hereinabove property. *(1992 and 1995 surveys attached)* |
| 08/17/1999 | 8166/968 | Prosper Bronder | Paul Houston | Warranty Deed for 114.414 acre tract...more fully described as Exhibit A & B attached...  This conveyance is made and accepted subject to the following matters, to the extent same are in effect at this time:  any and all restrictions, covenants, assessments, reservations...conditions, and easements, if any, relating to the hereinabove described property, but only to the extent they are still effect and shown of records in the herein above-mentioned County and State or to the extent they are apparent upon reasonable inspection of the property; and subject to all zoning laws, regulations and ordinances of municipal and/or government authorities, if any, but only to the extent they are still in effect and relating to the hereinabove property.  (No Exhibit "A" attached – Exhibit "B" is 1992 easement survey) |
| 09/27/1999 | 8166/973 | Prosper Bronder | Paul Houston | Deed of Trust for 115.414 acre tract.. "Save & except the 1.00 Acre previously conveyed to [Houstons] by [Bronders] on 05/12/1995." |
| 03/23/2007 | 12766/769 | Annie Friesenhahn | John Notzon | ...[convey]  28.00 acres out of 95.26 acre tract.. together with all privileges and appurtenances pertaining thereto, including any right, title and interest of Seller in and to adjacent streets, alleys or right of way; all |

| | | | | |
|---|---|---|---|---|
| | | | | easements benefiting the Property...This conveyance, however, is made and accepted subject to the following matters, to the extent same are in effect at this time: any and all restrictions, covenants, assessment, reservations ...conditions, and easements, if any, relating to the hereinabove described property, but only to the extent they are still effect and shown of records in the herein above-mentioned County and State or to the extent they are apparent upon reasonable inspection of the property; and subject to all zoning laws, regulations and ordinances of municipal and/or government authorities, if any, but only to the extent they are still in effect and relating to the hereinabove described property... *conveys to Grantee the property, together with all and singular the rights and appurtenances thereto in anywise belonging...* |
| 09/23/2008 | 13693/1209 | Annie Friesenhahn | Douglas J. Hedrick | **Warranty Deed:** All that certain tract of land containing 67.18 acres...being a portion of that certain 95.260 acres tract conveyed to Annie Friesenhahn, or record in Volume 6870, page 927...*Exceptions to Conveyance and Warranty: 5. Any validly existing titles or rights asserted by anyone...* |
| 09/23/2008 | 13693/1209 | Annie Friesenhahn | Douglas J. Hedrick | **Deed of Trust:**   Other Exceptions to Conveyance and Warranty: *As reflected in the Official Public Records of Bexar County, Texas, as of the date hereof.* |
| 04/18/2013 | 16064/1410 | Paul Houston | JBRF LLC | **Warranty Deed:**   [Conveyance] of property Tract I (115 acres) and Tract II (20 foot easement - 1992 survey) subject to the following matters, to the extent same are in effect at this time: any and all restrictions, covenants, assessments, reservations, ...conditions and easements, if any, relating to the hereinabove described property, but only to the extent they are still effect and shown of records in the herein above-mentioned County and State or to the extent they are apparent upon reasonable inspection of the property; **and subject to all zoning laws, regulations and ordinances of municipal and/or government authorities**, if any, but only to the extent they are still in effect and relating to the hereinabove described property . *conveys to Grantee the property, together with all and singular the rights and appurtenances thereto in anywise belonging.*. (attaches 2013 survey of 115 acre tract and 1992 survey of 20' easement) |

Exhibit A-1